## Case No. 8,418.

LIVINGSTON v. PROPRIETORS OF ORE BED.

[16 Blatchf. 549.] 1

Circuit Court, D. Connecticut. Aug. 1, 1879.

EQUITY—LACHES—FIFTY YEARS' ABANDONMENT.

L. filed a bill in equity against a corporation, to compel it to issue to him 50 shares of its stock, representing one-eighth of all its shares. The stock grew out of a bed of iron ore. L. claimed under a will made by H., who died in 1872. H. had enjoyed no benefit from the property for 50 years before he died. No demand was made for the stock till L. made it, in 1874. Other persons had openly enjoyed and claimed title to the same 50 shares from 1847. H. was, during the 50 years, in a position to know that his property, if any, was claimed and enjoyed by others. *Held*, that, because of acquiescence and laches and the staleness of the claim, L. could not recover.

[See Badger v. Badger, Case No. 718.]

[Bill by Herman T. Livingston against the proprietors of the Ore Bed in Salisbury for the recovery of fifty shares of stock and the dividends due upon the same.]

Thomas C. Ingersoll, Jacob F. Miller, and Jacob Sutherland, for plaintiff.

Donald J. Warner, Henry C. Robinson, and Charles B. Andrews, for defendant.

SHIPMAN, District Judge. This is a bill in equity to compel the defendant, a corporation established by the general assembly of Connecticut, to issue to the plaintiff, a resident and citizen of the state of New York, fifty shares of the stock of said corporation, which are alleged to belong to the plaintiff, and to pay the amount of the dividends which may have become due upon said stock, or for such other and further relief as the nature of the circumstances may require, and as may be just and equitable. In 1735, the governor and company of the colony of Connecticut, granted in fee to John Ashley an undivided fourth, and to each one of six other persons an undivided eighth, of a tract of land containing one hundred acres, situated in the town of Salisbury, and subsequently known as the "Ore Bed Ground," or the "Salisbury Ore Bed," and which contained valuable iron ore. In 1784, the pro-

1 [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

prietors of this tract were incorporated by the general assembly of this state under the name of "the Proprietors of the Ore Bed in Salisbury." The powers conferred were, in general, "to adopt, ordain and make such rules, regulations and by-laws as they shall judge reasonable and right for employing miners to raise said ore and promote the increase thereof, to appoint a committee or agent to order, direct and superintend the same, according to such rules and orders as he or they shall receive from the proprietors in their said annual meeting, and that such committee or agent shall have, and hereby are vested with, full power and authority, in his or their name, for and in behalf of the proprietors of said ore bed, to sue and prosecute to final judgment and execution any person or persons, whether proprietors or others, who shall, without his or their consent, dig or raise any ore in said bed, contrary to the rules or by-laws so adopted by said proprietors, or shall, in any wise, trespass upon the said common interest of the proprietors, the avails whereof they or he shall hold for the use and benefit of the common interest, and all cost and expenses attending the same shall be by such committee or agent paid out of the common treasury of said proprietors," and "to make and ordain all and every such rules, ordinances and by-laws concerning their common interest and the management of the same, that they shall judge necessary, so as the same be not repugnant to the general law of this state." About 1790, Robert Livingston, the last proprietor of the manor of Livingston, died seized and possessed in his own right, in fee, of an undivided four-eighths of said ore bed. He was, also, the owner of the Ancram furnace, in the state of New York. This furnace was about five miles from the ore bed, and was supplied with ore from his share of the bed. By his last will, duly proved and approved December 8th, 1790, before the surrogate's court for the county of Columbia, in the state of New York, his sons, Walter, Robert Cambridge, Henry, (subsequently known as "General Henry,") and John were made residuary devisees of all the real estate not specifically devised. His interest in the ore bed was a part of the residuary devise. He also devised to said four sons a large part of the manor of Livingston. After his father's death, Walter conveyed his estate in the part of the manor so devised, to his brother Henry. This part having been divided into four great lots, numbered one to four inclusive, by a deed of partition between Robert, John and Henry, dated October 4th, 1792, Robert took title to No. 2, John to No. 4, and Henry to Nos. 1 and 3. The Ancram furnace was in lot No. 3. Walter also conveyed his one-eighth of the ore bed to Henry, by deed of October 6th, 1792. General Henry, upon the organization of the corporation in 1784, was appointed its agent, and so continued until his death in

1823. Each proprietor was in the habit of receiving whatever ore he desired for his own purposes, of which an account was kept by an officer called "clerk of the hill;" and ore was sold to non-proprietors. Annually, or oftener, the accounts were adjusted and settled, and the amount due to each proprietor, by way of dividend or net profits, was paid. It is apparent, from the treasurer's accounts, which are preserved to the year 1802, that, up to that time, General Henry received the dividend or profits upon four-eighths of the ore bed business; and it is not doubted that he paid one-eighth to Robert Cambridge, or to his children. The book containing the treasurer's accounts from 1802 to 1835, has been lost, but memoranda of dividends, and drafts of accounts, for parts of eleven years, between 1820 and 1835, have been preserved. It does not appear when this payment of four-eighths to General Henry ceased, or when the payment of one-eighth directly to Robert's children commenced; but, in the years 1820 and 1821, General Henry received three-eighths, and thereafter the payments to him and to his devisee, and to his devisee's devisee, seem to have been, uniformly, the last named fractional part, while Robert's representatives took directly one-eighth. General Henry died in 1823, unmarried, and, by his last will, devised in fee to his nephew, Henry Livingston, afterwards called Henry of Claverack, son of John Livingston, "all my right, interest and estate of and in the ore bed and its appurtenances, situated in the town of Salisbury," and also devised to him one undivided half of great lot No. 3. John Livingston had died in October, 1822, aged 74, and, by his will, it appears that his son's inheritance of a share in his bachelor uncle's estate was not unexpected. John's will recites, that, "Whereas, my brother Henry Livingston has frequently and solemnly engaged that he will, by his last will and testament, or otherwise, give and devise to my said son Henry, his heirs and assigns, the one equal moiety of all that portion of the Manor of Livingston, * * * known and distinguished by the name of great lot No. 3, now," &c. General Henry and John lived within five miles of each other, and were reputed to be on very intimate terms. John's residuary devisee was his son Herman, who was thirty years old when his father died. Henry of Claverack was immediately appointed agent of the corporation, in place of his deceased uncle, and so continued until his death in the year 1828. He devised to his son Henry, (called "Dock,") the Ancram property, and all his right in the ore bed. The widow of Henry of Claverack claimed her dower in his estate, and, upon her petition, the court of probate for the district of Sharon set out to her a life estate in one undivided third part of three undivided eighth parts of the ore bed. Henry Livingston, (called "Dock,") and his wife conveyed, in

1843, to his brother Herman Livingston, and to his brothers-in-law, Alonzo Bogardus and James S. Talbot, the Ancram property, and his right and title in the ore bed. On March 5th, 1844, these three grantees, by a deed reciting, that, whereas, "General Henry Livingston, of the town of * * * was owner of three equal undivided eighth parts of the Salisbury ore bed, situate in the state of Connecticut," and by his will devised the same to Henry Livingston, of Claverack, who, by his will, devised the same to his son Henry, who, with his wife, had, on July 8th, 1843, by deed, conveyed all their right, title and interest of, in, or to the same Salisbury ore bed to them, the said Herman Livingston, Alonzo Bogardus and James S. Talbot, by which deed they became seized in fee, as tenants in common, of ⅜ths of the ore bed, and were desirous of severing their joint interest in the ore bed, released and conveyed to each other an undivided eighth thereof. These three-eighths, subsequently, and prior to 1847, were conveyed as follows: ⅛th by Herman to Timothy Chittenden; ⅛th to Maria S. Bogardus; and ⅛th to Orsamus Bushnell, trustee for Catherine L. Talbot. In the year 1844, the general assembly amended the defendant's charter. The amendment provided, among other things, that the property of the corporation should be deemed personal estate, to be divided into shares not exceeding $100 each, transferable in such manner as the corporation should direct. In the year 1847, the charter was further amended in manner following, omitting the preamble: "Sec. 1. The proprietors of said ore bed are hereby created a corporation, by the name of 'The Proprietors of the Ore Bed in Salisbury,' with a common seal, which they may establish and alter at pleasure, and that, by that name, they may sue and be sued, contract and be contracted with, and that they shall have all the powers and privileges which may be necessary to the full, complete and profitable enjoyment of their said property, rights and privileges. Sec. 2. The ore bed of said proprietors, and the rights and privileges of said proprietors to the same, and in the land aforesaid, are hereby declared, and the same hereafter shall be, personal estate and not real estate; and the same shall be a corporate stock, divisible into shares, not exceeding one hundred dollars per share, transferable on the books of the corporation in such manner as its by-laws shall direct. Sec. 3. The application of said proprietors, made by them, their guardians, agents or attorney, shall be binding upon said proprietors; and this resolve shall be binding upon all other proprietors who may not have joined in said petition, and who shall not, within one year from its passage, signify, in writing, to the clerk of said corporation, his dissent from the provisions of the same. Sec. 4. The shares of said proprietors in the corporate stock shall be in proportion to their respec-

·tive interests in said property; and any proprietors aggrieved by the refusal of said corporation to assign to him his relative share or shares of said stock, may have the same determined by proceedings upon a bill in equity, or by an action upon the case, in any court of competent jurisdiction. Sec. 5. The officers of said corporation shall consist of a president, clerk, who shall be sworn, and three directors, all of whom, after the first meeting, shall be chosen at the annual meeting of the corporation, by ballot. Sec. 6. The first meeting of said corporation may be called by the said William Ashley or Timothy Chittenden, by a notice published in the Litchfield Enquirer, three times before the day of holding said meeting; at which meeting the officers aforesaid may be chosen, and such by-laws, rules and regulations established as said corporation shall determine, which said by-laws, rules and regulations may be altered, modified or repealed, as occasion shall require, at any annual meeting of said corporation. Sec. 7. Said by-laws, rules and regulations shall contain nothing repugnant to the constitution and laws of this state; and this resolve shall at all times be subject to alteration or repeal by the general assembly. Sec. 8. Those parts of the resolves of 1784 and 1844 which are inconsistent with this resolve are hereby repealed." Under the amendment of 1847, the corporation was reorganized, at a meeting held August 25th, 1847, at which Timothy Chittenden, Orsamus Bushnell, trustee for Catherine L. Talbot, and Charles Paget, as attorney of Maria S. Bogardus, each claiming one-eighth part of the real estate, were present. At this meeting by-laws were adopted, providing, among other things, that the shares of the proprietors should be four hundred in number, of the expressed value of $100 per share, and for the form of the stock certificates. There was a contest between the Ashley and the Adam families, as to the title of two-sixteenths of one-eighth. Timothy Chittenden, William G. Bates and Samuel F. Adam were appointed a committee to ascertain the true owners of the ore bed, and report at the next annual meeting the names of said owners and the amount owned by each. At the next meeting, on November 30th, 1847, the following resolution was adopted: "That each individual proprietor in the ore bed, before he receives any stock or dividends, shall convey all his interest in said ore bed to the corporation; that, upon giving such conveyance, stock equal in amount to the interest of the proprietors shall be apportioned to such proprietor, upon his giving satisfactory security to the directors, to indemnify the corporation for all loss or damage it may sustain in consequence of issuing the same or paying dividends thereon, and that he will surrender, on demand, for cancellation, so much of said stock as shall appear to have been improperly issued." At a meeting held November 28th,

1848, the committee reported, "that the stock be issued to the several proprietors according to the proportions which have been paid for the last twenty years or upward, and that the corporation receive deeds from the several proprietors, of their respective shares in said ore bed, excepting that two-sixteenths part of one-eighth of said bed shall not be affected by such conveyances, and that the same shall be reserved, as a fund for the payment of debts and expenses, until the title to said fractional part shall be investigated, and·that, to secure the rights of the several proprietors to their shares of said two-sixteenths, the following vote (resolution) be passed, which shall save to each the same rights he now has to the same: 'That, whereas, for a period of more than twenty years, the rents and profits of the ore hill in Salisbury has been divided as follows, viz.: to the heirs of Philip Livingston and their grantees, three-eighth parts of the same; to William Ashley and his grantors, one-eighth; to Timothy Chittenden and his grantors, one-eighth; to the heirs of Samuel Forbes two-eighths and fourteen-sixteenths of one-eighth; and also to all the said proprietors, in like proportion, the remaining two-sixteenths of one-eighth part of the same: and, whereas, there is a difference of opinion between certain of the proprietors as to the ownership of two-sixteenths of one-eighth of said ore bed, now, therefore, it is hereby voted and declared, that the corporation will receive deeds from said proprietors, of the respective proportions of said ore bed, as above stated, and will issue stock to the owners of said ore bed according to the proportions above stated; and that the remaining two-sixteenths of one-eighth of said ore bed be left without any issue of scrip for the same, until otherwise ordered, when the title to the same shall be ascertained, and that, in the meantime, the rents and profits of the same be appropriated towards the payment of the debts and expenses of the corporation.' The report was accepted, and the accompanying vote was passed. A certificate for fifty shares of stock was issued to Timothy Chittenden, Orsamus Bushnell, trustee for Catherine L. Talbot, and Maria S. Bogardus, each. These one hundred and fifty shares of stock represent the same, and all the same, three-eighths interest which Robert Livingston devised to his sons, Henry, Walter and John. These shareholders conveyed, by separate deeds, to the company, their interest in the ore bed, and said Chittenden and said Bogardus annexed to their deeds a covenant, by which, after referring to the by-law or resolution requiring security, by way of indemnifying the corporation for all loss it might sustain, &c., they covenanted to indemnify the corporation against all loss or damage it might sustain by issuing stock to them, and against all loss or damage it might sustain by paying dividends thereon; and that they, their executors, &c., would, at any

and all times, surrender, on demand, for cancellation, so much of said stock as should appear to have been improperly issued." Dividends have regularly been paid to these shareholders, or to their assignees, upon said one hundred and fifty shares of stock, ever since the year 1847. Herman Livingston, son of John, died in May, 1872, aged eighty years, and, by his will, made Herman T. Livingston, the plaintiff, his residuary legatee and devisee, who made demand of the defendant for fifty shares of stock, on May 5th, 1874. This was the first demand ever made upon the corporation by any heir or representative of John Livingston. Herman Livingston asserted, in conversation with his son and others, in the latter part of his life, that he had an interest, through his father, in the Salisbury ore bed, which ought to be pressed. Since 1848, the corporation has been in entire and exclusive possession of the real estate. No fraud or concealment of facts on the part of the defendant; or of General Henry, or of his successors, is claimed.

Assuming what is denied by the defendant, that the wills of Robert and John were legally probated in this state, and, as probated, are competent evidence of the title to real estate in this state which was devised by such wills, it is apparent that an undivided one-eighth of the ore bed became vested in John, in fee, by the residuary devise in Robert's will, and that this one-eighth has never been conveyed by any recorded deed of John, Herman or Herman T.; and it is also apparent, that, at least since 1844, the grantees of the grand-nephew of General Henry have openly and continuously claimed to be the owners of the one-eighth which was devised to John.

For the purpose of deciding the questions which naturally arise under this equity proceeding, it is not necessary to determine whether there has been a technical ouster or disseisin or dispossession of John or Herman by any or all of their cotenants, or whether there has been such a series of acts, or claim of right or title or adverse possession, from which an ouster or dispossession can be presumed; but it is important to ascertain the real nature of the relations between General Henry and his brother John, or between their devisees, respecting John's interest or rights in the land or the profits arising from his one-eighth, if an ascertainment is practicable. The plaintiff's theory is, that General Henry was the representative of the Livingston family, in the management of the ore bed; and that, as such representative, he received the dividends or profits belonging to such branch, and paid John his share. The defendant's theory is, that there was an arrangement or agreement between the two brothers, by which John's share in the profits or in the land was sold or transferred to Henry. It is to be observed, that the testimony in the

case, except that derived from the record title and the deeds of the various parties, is exceedingly scanty. There are no memoranda or agreements or receipts or letters which throw any light upon the way in which General Henry and his brother regarded John's ore bed interest. This lack of evidence does not arise from any laches in the preparation of the case, for, the astute and learned counsel have, evidently, made diligent search in all the hiding places in which they supposed that information might be concealed. But, there are some significant facts which plainly appear. The ore bed interest which Robert Livingston owned, was not, in his lifetime, of large pecuniary value, but it was not an insignificant part of his great estate. It supplied his Ancram furnace with ore of a remarkable quality. Robert Livingston and his father diligently added to the one-eighth which Philip Livingston received by grant in 1735, until Robert owned, at his death, one-half of the bed. The ore bed right which John inherited did not probably disappear from his sight or memory, as a trifling affair. If Henry took it, he took it with the full knowledge of his brother. It is apparent to my mind, that, after John's death, in 1822, no moneys were paid upon ore bed account to Herman, his residuary legatee. If there had been, Herman, who was thirty years of age at his father's death, would have known and remembered the fact, and would not have waited until he was nearly eighty, before complaining that there was an interest in the ore bed which properly belonged to him. If he had ever received dividends, they would not have been quietly abandoned, while Robert's children were ̄n̄r̄ā̄l̄l̄y receiving their share; and such a fact would have been emphasized when he was making the general assertion that his father was interested in the ore bed, and that he did not believe that there had been any alienation of the interest. If, then, Herman did not receive any dividends, is it probable that there was a stoppage in payments at John's death? If Henry had been in the habit of paying dividends to John, that fact would have been known by John's children, and Herman would not naturally have permitted a change in the course of business without some expostulation and complaint; and the complaint would have been repeated as he informed his son of the loss of the interest. The theory that no dividends were paid to John gains some confirmation from this consideration: General Henry was the owner of great lot No. 3, in which was the Ancram furnace. He had promised to devise to John's son Henry one-half of this part of the manor. John knew, or expected, that his son was to be the heir of nearly one-half of his brother's patrimony, and might naturally have knowingly consented that the share of the ore bed, which was not of great value to him, but was of importance

to the owner of the furnace, should be enjoyed by Henry without compensation. There is no inherent improbability in the theory that no dividends were ever paid to John, and that the non-payment was the result of a friendly and family agreement to that effect, between two brothers who were on terms of intimacy, and who had made family treaties with each other in regard to their property, and that no deed or conveyance was ever made, but that it was understood that Henry was to be, in fact, the owner. But, in my opinion, the testimony in regard to the business relations between John and Henry is so scanty, that it cannot be found, either that no dividends were paid to John, or that no dividends were paid by reason of a family arrangement to that effect. It can, however, properly be found, that payment of dividends upon John's one-eighth was not made to his son after John's death in 1822.

It is not claimed that any facts were concealed from John or Herman, or that any fraud was practised upon them. It cannot be that they should not, in their lifetime, have known the condition of the ore bed rights. John and General Henry lived near each other, on terms of intimacy. General Henry was the agent of the corporation. Henry of Claverack, Herman's brother, was agent for five years after General Henry's death. Herman and John S. Livingston, son of Robert Cambridge, who sometimes attended the meetings of the corporation, were on quite intimate terms. It cannot reasonably be supposed that the affairs of this corporation, or its re-organization, should have been a sealed book to Herman during the fifty years after his father's death. He must naturally have known the general history of the corporation, and, knowing that his father had the legal title to one-eighth of the property, and believing that the title had never been transferred, it was his duty to look after the interest which he thought might belong to him, and, if he neglected or postponed that duty, his estate must suffer the consequences of his laches. If he was absorbed in other business and thoughts, and did not acquaint himself with the affairs of the corporation, he is still amenable to the charge of neglect.

What, then, is the position of the plaintiff, in a court of equity? He is claiming stock, growing out of real estate, the benefits of which his devisor did not enjoy for fifty years prior to his death, and which has been openly claimed, since 1841, by the present stockholders, or their assignors, as their own. The plaintiff's father remained silent while the corporation was being re-organized with no little deliberation, and no demand for stock was made until 1874. He was, during this fifty years, in a position to know the history of the corporation and of the interest in the ore bed which descended from his grandfather, and, while believing that his father's title had never been aliened, neglect-

ed to make any claim upon those who were notoriously in the enjoyment of the interest which he thought might be his own. The delay is owing to a want of the diligence "which is fairly to be expected from a reasonable person." Upton v. Tribilcock, 91 U. S. 45.

The principles which govern a court of equity in similar cases have been often stated, and are thus summarized in Badger v. Badger, 2 Wall. [69 U. S.] 87: "But there is a defence peculiar to courts of equity, founded on lapse of time and the staleness of the claim, where no statute of limitations governs the case. In such cases, courts of equity, acting upon their own inherent doctrine, of discouraging, for the peace of society, antiquated demands, refuse to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment, caused by the fraud or concealment of the parties in possession, which will appeal to the conscience of the chancellor." The same general principles, in their application to different classes of facts, are either stated or alluded to in Upton v. Tribilcock, 91 U. S. 45; Sullivan v. Railroad Co., 94 U. S. 806; Broderick's Will, 21 Wall. [88 U. S.] 503; 2 Story, Eq. Jur. § 1520, a. But, it is said that the corporation, by the act of 1847, became the trustee, of a direct express trust, created by the Act, and not by contract, to issue to the proprietors of the ore bed scrip for the shares of stock to which they were entitled, which trust has never been executed, and that, in consequence of the provisions of the resolution in regard to indemnity and of the taking of indemnity by the corporation, it is in the same position as if it still held unissued shares of stock which belonged to the plaintiff. Admitting that, at the time of the re-organization, the corporation became a trustee to issue stock to those who were entitled to it, it does not follow that lapse of time constitutes no bar to a claimant of stock whose stock has been issued bona fide to an apparently rightful owner, and as to which the trust is no longer admitted by the corporation to exist, and where there has been no fraudulent and successful concealment of the facts from the knowledge of the cestui que trust. Badger v. Badger, 2 Wall. [69 U. S.] 87. "It is often suggested, that lapse of time constitutes no bar, in cases of trust. But this proposition must be received with its appropriate qualifications. As long as the relation of trustee and cestui que trust is acknowledged to exist between the parties, and the trust is continued, lapse of time can constitute no bar to an account or other proper relief for the cestui que trust. But when this relation is no longer admitted to exist, or time and long acquiescence have

obscured the nature and character of the trust, or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief, upon the ground of lapse of time and its inability to do complete justice. This doctrine will apply even to cases of express trust." 2 Story, Eq. Jur. § 1520, a; Wilmerding v. Russ, 33 Conn. 67. Neither is it true, that, in this case, the corporation is in the same position as if it held unissued stock for an unknown owner. The stock was originally issued to proprietors in the proportions in which dividends had been paid for twenty years and upwards. The corporation endeavored to perform its duty by issuing stock to the apparently rightful claimants, and to the only claimants. The aggrieved had their remedy, not, however, if they slept upon their rights and acquiesced for a great length of time, and if, in consequence of their laches, the corporation and bona fide purchasers were to be injured. It is manifest, that, at this late day, the covenants of Chittenden and Bogardus furnish no satisfactory indemnity to the defendant. Their stock is now owned by different persons. Let the bill be dismissed.